FILED

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

CI JUL 17 PM 3: 04

JASON DRIGGERS and
SANDRA DRIGGERS, his wife,

CLERK US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

Plaintiffs,

CASE NO.: 3:00-CV-837-J-2

vs.

**DISPOSITIVE MOTION**

GEORGIA-PACIFIC CORPORATION,
a foreign corporation, and RAILSERVE,
INC., a foreign corporation,

Defendants.
_____/

## GEORGIA-PACIFIC CORPORATION'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56, Federal Rules of Civil Procedure, Defendant Georgia-Pacific

Corporation ("Georgia-Pacific"), respectfully submits this Memorandum of Law in Support of its

Motion for Summary Judgment.

## I.   INTRODUCTION

This case arises out of a May 27, 1997 incident at the Georgia-Pacific plant in Palatka,

Florida. **[Complaint ¶7]** The plaintiff, Jason Driggers ("Driggers"), alleges that he was injured

as a result of Georgia-Pacific's failure to properly maintain an area of the Palatka facility known

as the Kraft Loading Docks. **[Complaint ¶4]**  Georgia-Pacific's Palatka facility manufactures

various paper products, and those products are sometimes shipped via rail.  In this regard, there

are several miles of railroad tracks within the Palatka facility.  The railroad tracks allow Georgia-

Pacific to load paper products on to rail cars at or near where the products are manufactured and

transport those rail cars to a rail head just outside the facility, where they are then picked up by a

major railroad company such as CSX.



The movement of rail cars from point to point within the facility is known as "railroad switching," and Georgia-Pacific contracts with an outside company, Railserve, Inc. ("Railserve") to do this work. Driggers was employed by Railserve, and was acting in the course and scope of his employment at the time of the incident alleged in the Complaint. For the reasons that follow, Georgia-Pacific is entitled to summary judgment because the facts viewed, in a light most favorable to Driggers, reveal that Driggers was a "borrowed servant" at the time of the alleged incident. As a result, Georgia-Pacific is entitled to the benefit of Railserve's worker's compensation immunity, and may not be held liable for the incident alleged in the Complaint as a matter of law. Alternatively, Driggers's claim is barred by the election of remedies doctrine.

## II.    FACTUAL BACKGROUND[1]

The facts, when viewed in a light most favorable to Driggers, reveal that on or about August 31, 1995, Georgia-Pacific entered into a Switching Services Agreement ("Agreement") with Railserve. **[Haugh Depo. p.14:4-7; Exhibit 1]**[2] Under the terms of the Agreement, Railserve agreed to provide railroad switching services for Georgia-Pacific at the Palatka facility. **[Haugh Depo. Exhibit 1]** "Railroad switching" is defined as "all rail car movement within the [facility], excluding the initial placing of inbound cars and the puling of outbound cars from or to line haul movements by railroad companies with whom [Georgia-Pacific] may consign freight for line haul services." **[Haugh Depo. Exhibit 1, ¶ 1]** In connection with the Agreement, Railserve provided a locomotive and a switching crew to operate the locomotive. **[Haugh Depo. Exhibit 1, ¶ 1]**.

---

[1]    The facts contained herein are either undisputed or related in the light most favorable to Driggers.

[2]    May 4, 2001 Deposition of Kevin Haugh. The Agreement, as drafted, is actually between Georgia-Pacific and Rail Switching Services, Inc. Railserve acquired Rail Switching Services, Inc. in November, 1995. **[Haugh Depo. p.4:4-25]**.

At all times material, Railserve switching crews generally consisted of two men, a switchman and a service manager. **[Driggers Depo. p.44:5-16]**.[3]  Driggers began working for Railserve as a switchman, and was assigned to work permanently and exclusively at Georgia-Pacific's Palatka facility. **[Driggers Depo. p.43:16-44:7; 52:12-22]**.  At the time of his initial hire, Driggers worked under a service manager named Tom, and the two of them reported to John Tanner ("Tanner"), a Georgia-Pacific traffic manager/supervisor. **[Driggers Depo. p.44:5-16]**.

Driggers's description of his daily routine suggests that Georgia-Pacific exercised a great deal of control over the Railserve switching crew.  According to Driggers, Georgia-Pacific established an office for the switching crew at the Palatka facility. **[Driggers Depo. p.49:18-20]** Driggers and his service manager would report to work at seven or eight in the morning, and upon their arrival, would check the office answering machine for rail car movement instructions. **[Driggers Depo. p.49:11-16; p.50:6-11]**  Driggers' switching crew did not receive these movement instructions from Railserve employees, but instead received them directly from various Georgia-Pacific department heads, including Tanner. **[Driggers Depo. p.49:8-52:3]** Once Driggers completed the moves as directed by the messages on the answering machine, he would check with Tanner for additional movement instructions, and if Tanner had none, would go back to the Railserve office to await instructions from other Georgia-Pacific department heads. **[Driggers Depo. p.53:3-21]**  After initially being hired as a switchman, Driggers was promoted to service manager. **[Driggers Depo. p.66:2-15; 68:5-17]**  Nevertheless, Driggers continued to receive rail car movement instructions from Georgia-Pacific managers, including Tanner. **[Driggers Depo. p.71:6-p.72:5]**

---

[3]   May 3, 2001 Deposition of Jason Driggers.

On the day of the incident alleged in the Complaint, a Georgia-Pacific supervisor named Kit Yoma ("Yoma") instructed Driggers to move several rail cars to an area of the Palatka facility known as Kraft Loading Docks. **[Driggers Depo. p.140:18-p.141:25]**  Driggers had complained about this area in the past, noting that it was equipped with poor lighting, and contained an uneven track surface. **[Driggers Depo. p.134:4-135:9]**  Driggers contends that he raised these issues with Georgia-Pacific from time to time over a period of a year, but nothing was done.  Driggers ultimately told Tanner he would not move rail cars into the Kraft Shipping area until the lighting and track surface were improved. **[Driggers Depo. p.138:9-139:8]**  As a result, Driggers objected when Yoma instructed him to move rail cars into the area, but Yoma insisted, telling Driggers to "call whoever you need to call and get the cars" into the Kraft Shipping area. **[Driggers Depo. p.140:18-141:1]**  Driggers contacted Randy White ("White"), a Railserve representative, to discuss the instructions he had received from Yoma.  White advised Driggers to follow Yoma's instructions and move the rail cars. **[Driggers Depo. p.141:1-3]**.

As a result of the May 1997 incident, Driggers brings suit against Georgia-Pacific and Railserve seeking damages for the injuries he allegedly sustained.[4]  This case comes after Driggers filed and pursued his worker's compensation claim regarding the same injuries that are the basis for the instant suit. **[Driggers Depo. 222:1-7 and 223:7-22]**  That claim was settled, and the lump sum settlement was approved by the judge of compensation claims. **[Driggers Depo. Exhibit 8]**

---

[4]   Driggers' wife, Sabrina Driggers, has asserted a claim for loss of consortium. This is, of course, a derivative claim. As such, if Driggers' claim fails, so too does the consortium claim.

4

## III.   LEGAL ARGUMENT

### A.   Summary Judgment Standard

Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Entry of summary judgment is required upon an appropriate showing:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all of the facts immaterial.

Celotex Corp. v. Catrett, 324 106 S.Ct. 2548 (1986) at 2552-3 (emphasis added). Although the court must consider all the evidence in the light most favorable to the non-movant, "the non-moving party still bears the burden of coming forward with sufficient evidence of every element that he or she must prove." Rollins v. TechSouth, Inc., 833 F.2d 1525, 1529 (11th Cir. 1987). "There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *If the evidence is merely colorable or is not significantly probative, summary judgment may be granted."* Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2511 (1986) (emphasis added; citations omitted). Further, "[g]enuine issues of material fact cannot be based on mere speculation or the building of one inference upon another." Bailey v. Turner, 736 F.2d 963 (4th Cir. 1984). "The standard for summary judgment mirrors that for directed verdict, so that if on any part of the prima facia case there would be insufficient evidence to require submission of the case to a jury, we must affirm the grant of summary judgment." Barnes v. Southwest Forest Ind., 814 F.2d 607, 608 (11th Cir. 1987).

5

### B.     The Borrowed Servant Doctrine

"Florida law long has recognized the 'borrowed servant' [doctrine]." Halifax Paving, Inc. v. Scott & Jobalia Const. Co., Inc., 565 So. 2d 1346 (Fla. 1990) (citation omitted). A "general employer" is that employer who has contracted directly with an employee. However, a "special employer" is one to whom a general employer has loaned his employee. Stuyvesant Corp. v. Waterhouse, 74 So. 2d 554 (Fla. 1954). In the latter case, the employee is known as the "borrowed servant" or sometimes as a "special employee."  Under the borrowed servant doctrine, if a borrowed servant is injured while performing the work of the special employer, the borrowed employee is limited to worker's compensation benefits received and may not sue the special employer. See Booher v. Pepperidge Farm, Inc., 468 So. 2d 985 (Fla. 1985); Maxson v. Air Products and Chemicals, Inc., 554 So. 2d 1212, 1214 (Fla. 1st DCA 1990). In this case, the determination of employment status under the Workers' Compensation Act is a matter of law for the court. Judy v. Tri-State Motor Transit Co., 844 F.2d 1496 (11th Cir. 1988) (citing the Florida Supreme Court's opinions in Booher and Hamilton v. Shell Oil Co., 233 So. 2d 179 (Fla. 4th DCA), cert. denied, 237 So. 2d 762 (Fla. 1970) in holding that when the facts are undisputed, the determination of employment status is a question of law for the court).

In Judy, the plaintiff was employed by his employer Leroy Vanzandt, who leased tractors to the defendant Tri-State. The plaintiff was permanently assigned to drive the tractor leased to Tri-State. Tri-State procured workers' compensation insurance coverage, which was paid for by the plaintiff's general employer Vanzandt. Following a jury verdict in favor of the plaintiff in his personal injury action, the district court granted a judgment notwithstanding the verdict in favor of the defendant. Applying Florida law, the district court determined that the plaintiff "must be deemed an employee of Tri-State [i.e. a borrowed servant] and accordingly that his tort claim

6

against Tri-State was barred by the exclusive remedy provision of the Florida Workers' Compensation Act." 844 F.2d at 1499.

The Eleventh Circuit affirmed the district court, noting that the plaintiff was obligated to comply with Tri-State's rules and regulations and "was subject to Tri-State's direction and control". Id. at 1505. Accordingly, the Eleventh Circuit affirmed the district court and held that the workers' compensation benefits received by the plaintiff were his sole available remedy. As such, the plaintiff's suit was barred.

A similar holding is compelled by the uncontroverted facts in this case.

## C.    Worker's Compensation

Under Florida law, an employer is immune from an employee's tort suit for job-related injuries, provided the employer has not engaged in an intentional act designed to result in injury or death or engaged in conduct that is substantially certain to result in injury or death. Turner v. PCR, Inc., 754 So. 2d 683 (Fla. 2000).[5] The reason for this broad tort immunity is the sound public policy of ensuring an efficient and exclusive system of workers' compensation benefits. See § 440.015, Fla. Stat. (1999). Employers accept vicarious liability for work-related injuries (and waive their traditional defenses) in return for this expansive immunity from tort liability; in

---

[5]    The Federal Employer's Liability Act ("FELA") is not applicable in this case because Georgia-Pacific is not a "common carrier" and this accident occurred on an intra-plant rail facility. Courts have consistently held that intra-plant rail facilities within manufacturing plant premises are not subject to FELA claims. Bennett v. Weirton Steel Co., 660 F.Supp. 827 (N.D.W.V. 1987) (holding that in-plant facility was not a common carrier when the rail system was (1) operated solely intra-plant and on the premises of Weirton Steel and solely for the purpose of loading and unloading goods purchased by and for the use of Weirton Steel; (2) it was not used for transportation of goods or property of other individuals from any member of the public; (3) Weirton Steel did not receive remuneration for use of its rail system; and (4) the rail system was never held out to the public for hire or contracted for use by other entities); Greethurst v. Bethlehem Steel Corp., 380 F.Supp. 638 (N.D. Ind. 1974) (citations omitted); Duffy v. Armco Steel Corp., 225 F.Supp. 737 (W.D. Penn. 1964). The same holds true even when the rail facilities within the plant are extensive, and/or the intra-plant facility connects to a common carrier. Kieronski, 806 F.2d at 109 (6th Cir. 1987); Schutzenhofer v. Granite City Steel, 479 N.E.2d 406 (Ill. 5th Dist. 1985).

return, employees relinquish their traditional tort remedies for a system of workers' compensation benefits that spares them the cost, delay, and uncertainty of tort litigation. Chorak v. Naughton, 409 So. 2d 35 (Fla. 2d DCA 1981). As the Florida Supreme Court recently stated, the workers' compensation system is a "no-fault system" in which the "employee gives up a right to a common-law action for negligence in exchange for strict liability and the rapid recovery of benefits." PCR, Inc., 754 So. 2d at 686. In summary, the workers' compensation laws limit an employer's liability to compensation benefits only unless the injury is the result of an intentional tort by the employer against the employee. § 440.11, Fla. Stat. (1999); PCR, Inc., 754 So. 2d at 686.

To overcome the broad grant of workers' compensation immunity to employers, an employee must show that an employer engaged in conduct that amounts to an intentional tort. PCR, Inc., 754 So. 2d at 687. The Florida Supreme Court has recognized this "intentional tort exception" in a number of cases, which uniformly require a significantly heightened showing of intentional tortious conduct. See PCR, Inc.; Eller v. Shova, 630 So. 2d 537 (Fla. 1993); Fisher v. Shenandoah Gen. Constr. Co., 498 So. 2d 882 (Fla. 1986); Lawton v. Alpine Engineered Products, Inc., 498 So. 2d 879 (Fla. 1986).

The standard for determining whether workers' compensation immunity is lost is whether the employer "engaged in any intentional act designed to result in or that is substantially certain to result in injury or death to the employee." PCR, Inc., 754 So. 2d at 686 (citing Eller). Under this standard, the two ways in which immunity can be lost is either by (1) an act done with deliberate malice towards the employee or (2) an act that intentionally created a situation in which injury or death was a substantial certainty. PCR, Inc., 754 So.2d at 687. In this case, Driggers does not contend, nor is there evidence, that his injuries arose due to an intentional act of deliberate malice towards him or an act substantially certain to result in injury or death.

8

Rather, Driggers claim sounds entirely in negligence. As such, only the latter "substantial certainty" standard set forth in (2) is relevant.

In order to demonstrate that the "substantial certainty" test is met, an "objective" standard is applied. PCR, Inc., 754 So. 2d at 689. This standard analyzes the circumstances of a case to determine "whether a reasonable person would understand that the employer's conduct was 'substantially certain' to result in injury or death to the employee." Id. at 688. The employer's actual or subjective intent is not controlling and, instead, a court must review all the proof to determine whether the egregiousness of the employer's alleged conduct is such that death or injury was "substantially certain" to result.

As the Florida Supreme Court recently emphasized, employers are not liable in tort for an employee's injuries even if the employer's conduct is negligent or grossly negligent. PCR, Inc., 754 So. 2d at 687 n. 4 ("we continue to find that 'substantial certainty' requires a showing greater than 'gross negligence'"). The conduct must amount to such willfulness that a reasonable person could objectively infer that the employer should have known that its conduct was substantially certain to cause death or injury. Id. at 688. The employee's proof must objectively demonstrate that the challenged conduct was "substantially certain" to result in the injured alleged. Id. at 689.

This strict interpretation of the intentional tort requirement is appropriate because "nearly every accident, injury and sickness" occurring at or arising from the workplace results from some triggering act that could be deemed "intentional" in some respect. Fisher, 498 So. 2d at 884; David, 632 So. 2d at 125. The Florida Supreme Court in Fisher illustrated this point by stating as follows:

> [T]he mere knowledge and appreciation of a risk — something short of
> substantial certainty — is not intent. The defendant who acts in the belief or
> consciousness that the act is causing an appreciable risk of harm to another

9

may be negligent, and if the risk is great the conduct may be characterized as
reckless or wanton, but it is not an intentional wrong.

Fisher, 498 So. 2d at 884 (quoting PROSSER & KEETON ON TORTS, 36 (W. Keeton 5th ed. 1984)).

As this passage makes evident, the type of conduct necessary to overcome immunity is more

than negligence or recklessness; instead, what is required is evidence of intentional conduct that

is substantially certain to cause death or injury.

In this case, Driggers make no allegation of intentional conduct on the part of Georgia-

Pacific that is substantially certain to result in injury or death – nor can he. No such conduct

occurred. As such, Driggers cannot, as a matter of law, carry his "significantly heightened"

burden (of showing intentional conduct substantially certain to cause injury or death) to avoid

worker's compensation immunity. Accordingly, Railserve is immune from suit for the claims

raised in the Complaint and, under the borrowed servant doctrine, so too is Georgia-Pacific.

> **D.     Driggers Was A Borrowed Servant of Georgia-Pacific, And, As A Result,
> Georgia-Pacific Enjoys The Cloak Of Worker's Compensation Immunity.**

In the case at bar, Driggers received worker's compensation benefits for his injuries.

**[Driggers Depo. 222:1-7 and 223:7-22]**. Georgia-Pacific enjoys the benefit of the immunity

accompanying worker's compensation coverage because Driggers was the borrowed servant of

Georgia-Pacific.[6]

---

[6]     The allegation that Georgia-Pacific was engaged in "railroading" under the Hazardous
Occupation Act, Chapter 769, Florida Statutes, (Complaint at ¶ 2-3) has no impact on this
analysis. Section 769.02 provides an employee engaged in a hazardous occupation (such as
"railroading") with a cause of action under the Act, in which the burden is shifted to the
employer to prove it acted with reasonable and ordinary care. See § 769.02, Fla. Stat. (1999).
Driggers's suit is still barred despite his claim that he was engaged in a Hazardous Occupation.
As an initial matter, neither Georgia-Pacific nor Railserve was involved in "railroading" for
purposes of the Hazardous Occupation Act. Fruit Growers' Express Co. v. Norton, 116 So. 234
(Fla. 1928) (holding that the plaintiff employed by the defendant as a car repairer was not
engaged in railroading under the Hazardous Occupation Act, where the defendant's sole business
was to furnish common carriers with refrigerator cars. The court expressly noted that courts
lean "towards the construction of the word 'railroading' which links it to the occupation of a
common carrier engaged in the business of transporting persons or goods for hire"). Even if they

In Shelby Mutual Ins. Co. v. Aetna Ins. Co., 246 So. 2d 98 (Fla. 1971), the Florida Supreme Court enunciated the three-part test to determine whether the borrowed servant doctrine applies:

1)   Whether or not a contract for hire, express or implied, exists between the employer and the employee;

2)   Whether or not the work being done at the time of the injury was essentially that of the special employer; and

3)   Whether or not the power to control the details of the work being done at the time of the accident resided in the special employer [i.e. GP].

These factors are not co-equal. The first factor, that is the existence of a contract for hire, either express or implied, is the most important, and the second and third factors being merely indicators of the first factor. Id. at 101.

1.   Contract Between Special Employer and Georgia-Pacific Existed.

There is an implied contract between Driggers and Georgia-Pacific under which Driggers performed services at the direction and for the benefit of Georgia-Pacific.[7] "Under proper circumstances, consent to employment is implied from acceptance of a special employer's control." Maxson v. Air Products and Chemicals, Inc., 554 So. 2d 1212 (Fla. 1st DCA 1990).

In Maxson, Project Construction Co. contracted with Air Products and Chemicals, Inc., under which PCC would furnish manpower for APC projects. PCC would pay the salaries of the

---

were, however, Driggers's claim would nevertheless be barred by the worker's compensation immunity. See Macarages v. Raymond Concrete Pile Co., 220 F.2d 891 (5th Cir. 1955) (holding that an employee bringing a Hazardous Occupation Act claim who accepted the benefits offered by Chapter 440 was bound by the immunity therein afforded to employers); Crosby v. Regional Utility Board, 400 So. 2d 1024 (Fla. 1st DCA 1981) (holding that a right of action granted by the Hazardous Occupation Act is limited by the worker's compensation immunity where the employer had secured the benefits of the act to and for its employees); Richmond v. Liberty Mut. Ins. Co., 420 So. 2d 360 (Fla. 5th DCA 1982) (adopting the First District's decision in Crosby).

[7]   Importantly, there is an express contract between RSS and Georgia-Pacific under which Driggers worked permanently and exclusively at the Georgia-Pacific Palatka plant.

11

employees, provide its own supervisory personnel, and the contract expressly stated that no employee of PCC would be considered an APC employee. The plaintiff in Maxson was a PCC employee that worked at APC. At APC's request, the plaintiff worked permanently and exclusively in "Area B" as a train crew helper. The plaintiff was subsequently injured when he was crushed between two railroad cars. The First District affirmed the trial court's order vacating a jury verdict in the plaintiff's favor.

The district court analyzed the facts of the case with the three-prong test provided in Shelby. As to the first element, the court held that the "actual employment relationship, rather than the subjective intent of the employers, controls employment status." Id. at 1214. Quoting the Florida Supreme Court's opinion in Booher v. Pepperidge Farm, Inc., 468 So. 2d 985 (Fla. 1985), the district court held:

> The actual employment relationship rather than the subjective intent of the parties should control in any determination of whether a special employee may sue the special employer for work-related injuries. Booher's own trial testimony belies his contention that he never consented to an implied contract of hire with Pepperidge Farm. We agree with the district court that Pepperidge Farm was entitled to a directed verdict on this issue as a matter of law.

Id.

In the present case, the actual employment relationship between Georgia-Pacific and Driggers dictates that an implied contract of employment existed, and that Driggers was the special employee of Georgia-Pacific. Factors indicating such implied contract include benefit and right of control. Venezia v. Egan, 671 So. 2d 175 (Fla. 5th DCA 1996). These factors are present in the case at bar. The work was undoubtedly for the benefit of Georgia-Pacific. Georgia-Pacific exercised extensive control over Driggers's work by directing his activities – how many

rail cars to pick up or deliver, where to deliver them and when to deliver them.[8] **[Driggers Depo. 51:9-25]**.

      2.      <u>The Work Done By Driggers At The Time Of The Injury Was That Of Georgia-Pacific.</u>

It cannot seriously be disputed that the work done by Driggers at the time of the injury was essentially that of Georgia-Pacific. Driggers's sole function was to coordinate and move rail cars within Georgia-Pacific's intra-plant rail system so as to allow the cars to be loaded or unloaded at various loading docks within Georgia-Pacific's Palatka plant. <u>See</u> **[Driggers Depo. 52:25-53:1-14; 70:9-22; and 72:14-18]**. Driggers worked permanently and exclusively at Georgia-Pacific's Palatka plant in accomplishing that purpose. Driggers testified:

**Page 52: Lines 12 -22**

12    Q   But once you started working with Tom, the
13         other RailServe employee there at the Georgia-Pacific
14         Palatka plant, did you-all exclusively work there at
15         that plant?
16    A   Yes.
17    Q   You wouldn't go to another plant and do work
18         there?
19    A   No.
20    Q   And you didn't work for anybody else except
21         for at this Georgia-Pacific plant?
22    A   No one else.

**Page 70: Lines 9-14**

9    Q   What were the duties of service manager when
10        you took over that job?

---

[8]    The fact that the contract between Georgia-Pacific and RSS purports to maintain that RSS employees such as Driggers shall not be considered Georgia-Pacific employees for any purpose (Contract ¶ 14.01) is unimportant. Such language in the contract "is not of controlling significance." <u>Judy v. Tri-State Motor Transit Co.</u>, 844 F.2d 1496 (11th Cir. 1988) (quoting <u>Booher</u> in which the Florida Supreme Court "reiterated the necessity of 'looking through form to substance to determine whether an employment relationship exists'"). Accordingly, any argument by Driggers that the contract determines the nature of Driggers's employment is wholly without merit.

```
11    A   I was to coordinate all the moves with John
12    Tanner.  And if there was any leaks or anything, report
13    them in, and just oversee the daily operations of the
14    moving of the train cars, spotting.
```

As such, Driggers's work done at the time he was injured was undeniably that of

Georgia-Pacific and for Georgia-Pacific's benefit.

> 3.    Georgia-Pacific Exercised Extensive Control Over The Work Of
>       Driggers.

Georgia-Pacific possessed and exercised extensive power to control the details of

Driggers's work being done at the time of the accident alleged in the complaint. Georgia-Pacific

managers told Driggers how many cars to move, where to move them, and when to move them.

**[Driggers Depo. 51:9-25 and 52:1-3]**.   All of Driggers's work was performed at Georgia-

Pacific's Palatka plant.  **[Driggers Depo. 52:12-22]**. Georgia-Pacific's extensive control of

Driggers's work is clear. Indeed, John Tanner exerted such control over the work performed by

Driggers, that Driggers considered John Tanner his "supervisor." Driggers's testified:

**Page 52: Lines 1 – 3**

```
1    Q   And so was John Tanner the supervisor for the
2         work that RailServe was doing at the time you started?
3    A   Yes, he was traffic manager for GP.
```

**Page 52: Lines 25**

```
25    Q   And you've mentioned that you come in in the
```

**Page 53: Lines 1 -14**

```
1    morning and you'd have -- the answering machine would
2    tell you what rail cars the Georgia-Pacific managers
3    wanted moved. After you finished that initial set of
4    movements of cars, what did you do next in a typical
5    day?
6    A   Check with John Tanner to see if anything had
7    been called in to him.
8    Q   And what would usually happen when you did
9    that?
10    A   If we had any other moves, we'd make those.
```

14

11    Q   And Tanner would tell you, you know, there's
12    some other cars that need to be moved, that kind of
13    thing?
14    A   Yes.

**Page 71: Lines 6 –25**

6     Q   All right. So let me take you through it.
7     When -- talking about now when you were service manager,
8     from the time you started until the time that you left
9     that position, what was your daily routine in terms of
10    coming in in the morning and how you would figure out
11    what you needed to do that day?
12    A   I would come in, take any messages down that
13    was on the answering machine, then I personally would go
14    over and visit with John Tanner, go in the office with
15    him, take anything that he had as far as moves while my
16    engineer was cranking the train. We'd come out, go to
17    the yard, collect up the cars we needed for the day and
18    go start making the switches.
19    Q   And so your supervisor there was John Tanner
20    of Georgia-Pacific?
21    A   Yes.
22    Q   And he was the one that would tell you where
23    they needed rail cars moved there at the GP facility?
24    A   Any special moves.
25    Q   All right. And you also would receive calls

**Page 72: Lines 1-5**

1     directly from managers of the different areas at GP
2     telling you where they needed you to bring rail cars?
3     A   Yes.
4     Q   And that's how you decided what you were going
5     to do for the day?
6     Yes.

**Page 72: Lines 14 – 18**

14    Q   So once you moved all the rail cars that the
15    GP managers asked you to move, you would stand by and
16    see if they needed anything done until the end of the
17    day?
18    A   Yes.

Driggers's own deposition testimony reveals the extensive control Georgia-Pacific exerted on the work to be performed by Driggers. The extensive control exercised by Georgia-Pacific cannot legitimately be disputed.

As a result, the three-prong test outlined in Shelby is satisfied. The borrowed servant doctrine applies. Railserve is immune from this suit because it enjoys the cloak of the workers' compensation immunity. Under the borrowed servant doctrine, so too does Georgia-Pacific. Thus, Driggers's suit arising from injuries sustained while performing work at, for, and at the direction of Georgia-Pacific is barred. See Booher, 468 So. 2d 985.

**E. Alternatively, Driggers's Claim Is Barred By The Election of Remedies Doctrine.**

Should the Court determine that workers' compensation is not the exclusive remedy available to Driggers for the injuries alleged in the Complaint, Driggers's claims still are barred by the election of remedies doctrine. The doctrine of election of remedies is an application of the doctrine of estoppel on the theory that one electing should not later be permitted to avail himself of an inconsistent course. Williams v. Robineau, 124 Fla. 422, 168 So. 644, 646 (1936); Moniz v. Reitano Enterprises, Inc., 709 So. 2d 150 (Fla. 4th DCA 1998) (citing Williams). "It is a choice shown by an overt act between two inconsistent rights, either of which may be asserted at the will of the chooser alone. It is generally conceded that to be conclusive it must be efficacious to some extent." 168 So. At 426; see also, Moniz, 709 So. 2d at 153.

It is well-established in Florida law that when an injured party actively pursues and receives workers' compensation benefits, an election of remedies is properly found. Michael v. Centex-Rooney Constr. Co, Inc., 645 So. 2d 133 (Fla. 4th DCA 1994); Chiang v. Wildcat Groves, Inc., 703 So. 2d 1083 (Fla. 2d DCA 1997) (expressly agreeing with the principle and result reached in Michael); Lowry v. Logan, 650 So. 2d 653, 656 (Fla. 1st DCA 1995) (citing Michael for the principle that "A successful compensation claim in Florida bars a subsequent damages

16

suit"). The same is true when a claimant that has filed a workers' compensation claim reaches a settlement with his employer and the employer's workers' compensation carrier. See Michael; Moniz, 709 So. 2d 150 ("we consider the workers' compensation claim settlement for $20,000 to be an 'efficacious' settlement within the meaning of Robineau"). Accordingly, the election of remedies doctrine precludes an employee from later suing an employer in tort after the employee actively pursues and receives workers' compensation benefits. Chiang v. Wildcat Groves, Inc., 703 So. 2d 1083 (Fla. 2d DCA 1997); Mandico v. Taos Constr., Inc., 605 So. 2d 850 (Fla. 1992) (when an injured person claims and receives workers' compensation benefits an election of remedies is found); Ferraro v. Marr, 467 So. 2d 809 (Fla. 2d DCA 1985); Ferraro v. Marr, 490 So. 2d 188, *rev. denied* 496 So. 2d 143 (Fla. 1986); Michael, 645 So. 2d 133.

In Michael, the plaintiff was an employee of Regal Kitchens, Inc. ("Regal"). Regal entered into a subcontract with Rooney, the general contractor of a construction project. The plaintiff was injured while working at the project of which Rooney was the general contractor. The plaintiff filed a workers' compensation claim with Regal and its workers' compensation carrier. The claim was initially rejected. The plaintiff submitted his claim to a judge of compensation claims, who ruled that he was not entitled to workers' compensation benefits because he was an independent contractor. The plaintiff appealed that decision. While that claim was on appeal, the plaintiff, Regal and the workers' compensation carrier reached a lump sum settlement for $6,500, which was approved by the judge of compensation claims. Despite that settlement, the plaintiff continued to pursue his action against Rooney, the general contractor.

Recognizing and relying on the well-established principles outlined above, the Fourth District approved and adopted the language of the trial court, which held,

> In this particular case, [the plaintiff] clearly elected his remedy when he voluntarily accepted a settlement in the workers' compensation forum. That forum may, or may not, have afforded him a complete remedy for his unfortunate situation. Nonetheless he affirmatively sought, and utilized it.

17

> He chose not to allow appellate consideration of a ruling adverse to him, but instead accepted the settlement benefits of a Chapter 440 case.
>
> To allow continuation of a separate civil action in this court for personal injuries under the circumstances existing in this case would clearly thwart the entire purpose for workers' compensation laws. ... Michael not only elected his remedy, but he accepted and received the benefits of that decision.

Id. at 135. As such, the Fourth District affirmed the summary final judgment entered by the trial court in favor of the general contractor. See also Moniz v. Reitano Enterprises, Inc. 709 So. 2d 150 (Fla. 4th DCA 1998) in which the court held that certain counts of the plaintiff's complaint barred by the election of remedies doctrine.

Likewise in the case at bar, Driggers's case is barred by the election of remedies doctrine. Driggers filed and pursued a worker's compensation claim. **[Driggers Depo. p.222:1-7]** Driggers's workers' compensation claim was settled, and the lump sum settlement was approved by the judge of compensation claims. **[Driggers Depo. Exhibit 8]** This settlement is efficacious under Robineau. Moniz, 709 So. 2d 150. As in Michael, Driggers's suit against Georgia-Pacific is barred because Driggers made a conscious election of remedies. He, by pursuing his workers' compensation claim, chose the remedy available in the workers' compensation forum. Indeed, he reaped the benefits of that decision by receiving a lump sum settlement. **[Driggers Depo. Exhibit 8]** To allow Driggers to continue this action against Georgia-Pacific, Driggers's special employer, would thwart the very purpose of the Workers' Compensation Act.[9] Driggers may not now elect an inconsistent remedy by bringing this action against Railserve and Georgia-Pacific. Michael, 645 So. 2d 133. To do so is patently inconsistent with the workers' compensation forum of which Driggers availed himself. By utilizing this forum, workers' compensation became Driggers's exclusive remedy for his alleged injuries, § 440.11, Florida Statutes, and the

---

[9]   See section III.C., *supra*.

18

statutory immunity cloaked both Railserve and Georgia-Pacific. Accordingly, Driggers claim against Georgia-Pacific is barred by the election of remedies doctrine.

<u>**Conclusion**</u>

WHEREFORE, for all of the foregoing reasons, Defendant Georgia-Pacific Corporation respectfully requests this Court to enter an Order granting summary final judgment in favor of Defendant Georgia-Pacific Corporation.

Respectfully submitted,

HOLLAND & KNIGHT LLP

Thomas E. Bishop
Florida Bar No. 0956236
Gregory Williamson
Florida Bar No. 0092990
Adrian G. Soud
Florida Bar No. 0175153
50 N. Laura Street, Suite 3900
Jacksonville, Florida 32202
(904) 353-2000 (telephone)
(904) 358-1872 (facsimile)

Attorneys for Defendant
Georgia-Pacific Corporation

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished, by U.S. Mail, this 17th day of July, 2001, to CHOBEE EBBETS, P.A., Ebbets, Armstrong, Chamberlin & Traster, 210 South Beach Street, Suite 200, Daytona Beach, Florida 32114 and VICTOR M. HALBACH, JR., ESQUIRE, Marks, Gray, P.A., P. O. Box 447, Jacksonville, Florida 32201-0447.

Attorney