F!! FD

01 OCT 31 AM 9: 26

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JASON DRIGGERS and SABRINA
DRIGGERS, his wife,

    Plaintiffs,

-vs-                                          Case No. 3:00-cv-837-J-20TEM

GEORGIA-PACIFIC CORPORATION,
a foreign corporation, and RAILSERVE,
INC., a foreign corporation,

    Defendants.
_____/

**PLAINTIFFS' REPLY TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT incorporating MOTION TO EXTEND TIME
FOR RESPONSE TIME SET FORTH IN LOCAL RULES BASED
UPON GOOD CAUSE AND EXCUSABLE NEGLECT
incorporating MEMORANDUM OF LAW**
---------------------------
**REQUEST FOR ORAL ARGUMENT AS TO THE
SUMMARY JUDGMENT MOTION**

**Note: This is a response to a Dispositive Motion**

The Plaintiffs, by and through undesigned counsel hereby reply to the Motion for

Summary Judgment filed by the defendant, Georgia Pacific, moving

contemporaneously for an extension of time to file the following Response and Reply

based upon a showing of good cause and seeking an Order denying Plaintiff's Motion

for Summary Judgment, stating as grounds the following:

**Overview:**

This is a personal injury action filed by Plaintiffs due to an accident occurring on

May 27, 1997 in a warehouse/railroad loading dock area, owned, maintained and

controlled by Georgia Pacific and located in Palatka, Florida. Following the depositions

of the Plaintiff and of a corporate representative of a former party, Railserve, Inc.,

Georgia Pacific filed a Motion for Summary Judgment based upon a contention that the

Georgia Pacific enjoyed the statutory immunity afforded under Florida Statute 440.39

(commonly known as the Florida Worker's Compensation Statute) under a theory that



-2-

Driggers was a "borrowed servant" at the time of the accident.

Plaintiff disputes this fact and believes that there are material issues of fact which would preclude the entry of a Summary Judgment in favor of defendant and further, that there is no legal basis for such a conclusion of law.

## I. Plaintiff's Motion for Extension of Time as to Local Rule 3.01

Plaintiffs' counsel is cognizant of Local Rule 3.01 requiring that the party opposing a Motion file and serve a brief or legal memorandum within 10 days after service. According to the Court file, Defendants' Motion was dated July 17, 2001. Undersigned counsel was never aware of the Motion being filed until Friday, October 26, 2001. As reflected in the attached affidavit, this Motion was never received and docketed into this office through the normal course of business. Instead of receiving a pleading through the US Mail, at some point in time, the Defendant, prepared a black "3 inch ring binder" and sent this binder containing the Motion to the office of undersigned counsel. Since it was not a normal piece of mail, the docketing secretary handed the notebook to a paralegal intern form a local Junior College, who placed it with the medical notebooks in our office maintain on each client. Undersigned counsel had created a system where medical records were kept in 3 ring binders identical to what had been sent The intern mistook the black notebook as medical records and placed in on the shelf where such records are maintained. On Friday, October 26, 2001, undersigned counsel instructed his staff to put all the collective file materials together in preparation for arbitration on October 29, 2001 at which time the notebook containing the Motion was Discovered.

The docketing secretary did not open the notebook to determine its contents, but instead gave it immediately the paralegal intern, which was outside the control of counsel. It is further important to point out that at no time has undesigned counsel had any conversations with any member of opposing counsel's law firm regarding the fact that the Motion had been filed and whether there would be any response, etc. In that this was a dispositive motion involving a Motion for Summary Judgment, opposing

counsel was exempted from contacting undesigned counsel to determine whether the Motion could be resolved without hearing as permitted by Rule 3.01 (g).

Under these circumstances, the failure to respond to the defendant's Motion within the 10 day time period was the result of excusable neglect and was not at any time an intentional disregard of the rules of this Court. The closest case on point establishing this point of law is *Hibernia National Bank v. Administracion Central Sociedad Anonima,* 776 F.2d 1277 (La. 5th C.A. 1985) In that case, the court found that an attorney's failure to follow a local rule on filing responsive pleadings to a motion for summary judgment should have been excused where the district judge's notice did not reach the attorney until the day after the deadline for filing had passed and where, as here, upon notice of the document, the attorney moved with all deliberate speed secure leave of court for filing.

It is important to note that in the present case, the Honorable Court has not set a date for the filing of responsive affidavits as contemplated by Rule 56 of the Federal Rules of Civil Procedure, which would have to be completed within 10 days of said hearing date. It is understood, based upon prior practice before this Court, that the court indeed prepares such an Order. Therefore, under the circumstances of this Motion, and within the contemplation of the Rules of Civil Procedure, a party would normally have up until 10 days before hearing to file counter affidavits. In this instance, due toe the absence of any set date for disposition of the Motion, there is absolutely no harm nor prejudice to the defendant, nor to the administration of justice in granting this requested relief.

**II. Plaintiffs' Response to the Merits of Defendant's Motion for Summary Judgment:**

Plaintiff, Jason Driggers was not at any time a "borrowed servant". The facts in this case simply do not support such a contention. Plaintiff's would submit that following are the actual facts of this case as revealed by the evidence adduced thus far and based upon the affidavit of the Plaintiff. Jason Driggers which will be filed in opposition to the Motion.

-4-

Jason Driggers was at all times an employee of RailServe, Inc. He was initially hired by RailServe, he was paid by RailServe and he was at all times supervised by RailServe, Inc. RailServe was a company that had contracted with Georgia Pacific to provide Rail Switching services to the defendant, Georgia Pacific. What this meant was that Georgia Pacific, operated a plant in Palatka, Florida which contained 7 miles of railroad track which was used for the loading and unloading of products which it manufactured and shipped. Georgia Pacific was never in the railroading business and therefore needed a railroad company with the expertise to perform these services. As a consequence of that fact, RailServe and Georgia Pacific entered into a very detailed Contract in order for these services to be provided. That Contract, referred to by the Defendant in their Motion governed the operations and duties between the two parties.

Subsection 14 of the contract states as follows (see attached highlighted copy, attached as Exhibit 1 to this document):

14.    **Independent Contractor Status**

14.01   RSS shall render Switching Services hereunder in the capacity of an *independent contractor*. Employees of RSS performing Switching Services hereunder shall be hired, supervised, managed, controlled, disciplined, and discharged exclusively by RSS and shall not be deemed to be employees of G-P *for any purpose whatsoever*. (Emphasis supplied).

Despite this language, Georgia Pacific is taking the position for purposes of its argument that Jason Driggers was actually their employee under the borrowed servant doctrine. This creative argument is contrary to the law which has developed that doctrine for a very narrow set for circumstances and is contrary to the known and established facts in this case.

The borrowed servant situation normally comes about when a general contractor brings in a temporary instrumentality, like a crane and a temporary operator for that instrumentality and directs the details of the work of the loaned or borrowed servant. Thus, in such a situation, the contractor has been found to be the

"special employer" under such unique circumstances and if found to be such an employer, would be able to take advantage of the immunity from suit afforded an employer whose employee has received worker's compensation benefits. There are several cases which exemplify this analysis. *Halifax Paving v. Scott & Jacobi Construction Co.* 565 So.2d 1346 (Fla. 1990); *Stuyvesant Corporation v. Waterhouse*, 74 So.2d 554 (Fla. 1954); *Burton v. Diamond Sand and Stone Co.*, 327 So.2d 95 (Fla. 2d DCA 1976); *Tri-City Electric C. v. Barrs*, 201 So.2d 265 (Fla 3rd DCA 1967) and *Belevedere Construction Co. v. Shelton*, 362 So.2d 431 (Fla. 4th DCA 1978).

None of the factors and principles established in these cases exist under the facts before this court. Plaintiff's agree that the law to be applied to this case is best summarized by the Florida Supreme Court in the case of *Shelby Mutual Insurance Co. v. Aetna Insurance Co.*, 246 So.2d 98 (Fla. 1971), which applied the three pronged test which is used by the courts of Florida to determine the status of the employee. However, none of the prongs of this test are established by the facts before this court, despite Defendant's argument to the contrary.

1. Was there a Contract between the parties which established the special employer's right of control over the special or loaned employee? Georgia Pacific asserts that there was an "implied contract" between Driggers and G-P. (see page 7 of their motion and brief). However, what they immediately are dismissing is the existence of a written contract which spells out the duties of the parties and defines clearly who is an employee of whom! As noted above, the parties had a written contract specifying the status of employment and clearly stating that Driggers was not to be considered an employee of G-P for any purposes. In addition to the quoted language, the contract provided for clarity in who was responsible for payment of salary (G-P) and further delineated the responsibilities between the parties as to who would be responsible for certain duties and activities.

The important feature of this contract is that it not only defeats the defendant's argument that an "implied contract" existed, it in addition, specifically stated that G-P

and not Railserve had a duty and responsibility to "...keep the tracks clear and passable at all times, and RSS shall have no liability for failure to provide switching services if G-P fails to keep the tracks clear and passable, unless the obstruction is due to the negligence act or omission of RSS." *See: Pages 4-5 of Exhibit 1 attached hereto.*

The reason that this is important is that the Plaintiff's case is based upon G-P's alleged failure to keep the tracks "clear and passable" in that there was debris left in and upon the Track #7 by employees of G-P which lead to the injuries to the plaintiff.

As stated in the deposition of G-P employee, Billy Dunning (filed herein by Plaintiff in opposition to the Motion for Summary Judgment), G-P had the duty to see the track area where the accident occurred was kept free of debris. As background, the Court is requested to note that Mr. Dunning was the maintenance supervisor with G-P (Dunning Depo. page 4, Line 16). He states that people known as "pushers" in the employ of G-P had a duty to keep the tracks safe and that during a period of 5-6 years before the accident in 1997, Track 7 would be inspected one a monthly basis by his department and regularly by Shipping Department employees of G-P would be be closing to the doors on the boxcar after they were loaded by G-P employees in the area where the accident occurred. (Dunning Depo. pages 37 - 39).  The record establishes that G-P was on notice of a failure to meet their contractually assumed and stated responsibilities in that Mr. Dunning testified that he was aware of debris problems being left in Track 7 which had happened before Drigger's accident. On one occasion a car was derailed due to debris on the Track (Dunning Depo. page 40, Lines 2 through 16). In addition, his department had been called down "a few times to clean debris on the track" at the location of the accident. (Dunning Depo. page 41, Line 7)   This occurred in 1995 and 1996 (page 46, line 3) and involved debris inside the warehouse section of track 7, which is where the accident occurred.  He personally sent crews to pick up debris on two occasion between October 1996 and the accident in may 1997 (Dunning Depo. pages 47-48).

The debris involved here was packing materials left behind by G-P employees.

-7-

Mr. Driggers was injured when a 2 x 4 flew up and knocked him off a rail car as he was working as the car switcher. Mr. Dunning testified that the debris that he observed on the tracks in this area was banding materials and "two by fours." (Dunning Depo. page 49, Line 9) Dunning testified that he complained to the G-P shipping department head, Doyle York, because the debris was their responsibility (Dunning Depo, page 57, line 24-25). Thus, a gravamen of this Compliant is that G-P did not maintain the are in a safe condition. Plaintiff has established notice of the dangerous condition and further established that G-P created the dangerous condition.

In addition, Mr. Driggers has alleged in the Complaint that there was inadequate lighting which contributed to his being injured. Mr. John Tanner, transportation manager for G-P, stated that prior to the accident he was aware of people "... voicing concerns about the lighting in that area." (Tanner depo, page 28, line 18-23). These concerns were in turn again communicated to Doyle York (page 29, line 1). The lighting was inadequate due to bulbs being burned out and needing replacing. (page 29, line 3). This was an independent responsibility held by Defendant, G-P an owed to the plaintiff to be handled reasonably. The Defendant has been attempting to distract attention to these failings by creating a defense that the Plaintiff can't sue G-P because he was really their employee despite the contract which states otherwise.

2. Was the work being performed by Driggers at the time he was injured "essentially that of G-P."? (Prong 2 of the Shelby Test).

The above factual references help to establish that G-P is in the wood and paper product business. They manufacture and sell such products at their plant. These were the types of products going out of the Kraft Warehouse located at Track 7. However, the "Switching Services Agreement" further clarifies this issue is a written fashion. It states that "RSS (RailServe) is a corporation engaged in the provision of railroad switching and related switching services." Driggers was not in the business of making paper/wood products, loading these products, unloading these products, etc. He was an employee of an independent contractor, RailServe, which was involved in the rail

road business, because G-P had to  move large quantities of the product off the premises. Defendant states in their Motion that this issue cannot be seriously disputed. However, there is not a single reference to a fact which establishes that G-P was in the railroading business at the time of the accident. Driggers was performing a railroading function.  he was moving a car that was being pulled by a locomotive.  The locomotive was owned by RailServe, not G-P. The various duties for safely and properly coupling the car, braking and unbraking the car and moving the car on the rails had been delegated by contract to RailServe, because this was not the business of G-P. There is not one sentence of any deposition that is offered by G-P that states that G-P was involved in railroading.  they simply owned the tracks and agreed to keep them free of debris, separate of duties owed by RailServe employees.

3. Did G-P exercise control over the **details** of the work being done by Driggers at the time of the accident? (Prong 3 of the *Shelby* case).

The answer is simple: absolutely not.  This is again an area where G-P in their brief (page 9) make blanket statements and assertions that are contrary to the evidence and at the very least are not placed in context. All G-P did was to tell Driggers when it needed boxcars for shipment purposes and where they were needed.  The only contact between G-P and Driggers was a message in the morning advising him of the cars needed and where.  Context is everything in this regard.

a. He was trained at the G-P plant by RailServe.  (Drigger depo, page 45)

b. He was supplied safety manuals of both RailServe and G-P (page 45)

c. He was shown how to run the locomotive owned and operated by RailServe, not G-P, employees (page 46-47 ).

d. His contact with G-P was through calls as to what cars needed to be "spotted" and where. (page 49)  The full context of his relationship is not revealed on page 49 where he states that he reported to John Tanner.  Upon further questioning he stated the following (Page 197 of  Drigger's deposition):

Q - You referred to him [Tanner} at one point as your supervisor.  Was he your supervisor or was he the customer representative for Georgia Pacific?
A - Customer representative. I'm sorry

This is the extent of the involvement between G-P and Driggers with respect on the work to be performed.  G-P presents as facts that RailServe had an office on the premises of G-P.  Reading the Contract again clarifies this issue.  RailServe was allowed to have their own trailer located on G-P property.  G-P did not own the trailer (see paragraph 20 of the Contract).  In fact, they (RailServe) had to pay for any long distance phone calls from he trailer.  As stated above, the first page of the agreement provided that there were specific railroad duties that G-P was delegating to RailServe under contract.  No one has testified that anyone at G-P told Driggers had to perform the actual day to day duties that were involved in his job.  The duties involved in how to properly and safely move the railroad cars with the locomotive, couple and uncouple cars, start and stop cars, etc.  In G-P had persons capable of doing these specific tasks than they would not have needed the contract.  There was no one from G-P present at the time of the accident participating in the movement of the boxcars.  These functions were performed by the RailServe engineer and Driggers alone.  The legal standard is not one of a broad brush, but  rather an attention to details.  The courts have universally stated that this part of the test involves a determination as to whether the general employer has retained any control over the employee's actions and in fact has relinquished *all* control to the special employer.  *See: Tri-City Electric Co. v. Barrs,* 201 So.2d 265 (Fla. 3rd DCA 1967); *Berrier v. Associated Indemnity Co.,* 196 So. 188 (Fla. 1939) and *Stuyvesant Corp. v. Waterhouse,* 74 So.2d 554 (Fla. 1954) [Which identities that the special employer had the right to control the details of the employees work.] The special employer must have the right to direct both the type of work performed by the borrowed employee and the manner the work is performed.  *Burton v. Diamond Sand and Stone Co.,* 327 So.2d 95 (Fla. 2d DCA 1976); *Tri-City Electric C. v. Barrs,* 201 So.2d 265 (Fla 3rd DCA 1967).

All of these legal principles establish that the defendant cannot show that Driggers was a borrowed servant which  then creates immunity as to G-P. None of the cases cited by defendant deal with the specific factual issues before this court. The

citations are to general statements of law without looking at the facts which created the immunity. The *Judy* case cited by Defendant does not detail what the degree of control was that was exercised by the special employer. It does not detail who paid the salary or examine the other factors enunciate above. It is simply not factually similar to the case before the court.

Finally, there are certainly sufficient factual issues that would prevent the entry of a summary judgment. As noted in the *Tri-City* case *supra,* this issue involves questions of fact to be resolved by a jury.

### III. Regarding the Merits of the Election of Remedies Doctrine

The entire portion of the defendant's argument in this regard is without merit. Much of the Plaintiff's Motion deals with worker's compensation benefits in the State of Florida, being the exclusive form of remedy *against an employer* under Florida Statute 440. et seq.     There is no argument on this point. Am injured employee must pursue the claim against his employer under the worker's compensation laws of this State. He cannot sue RailServe, unless it  had committed an intentional act against Driggers or committed some other very narrowly defined act constituting an exception. Prior to suit, Plaintiff was unable to secure out of court statements relative to these issues. As a consequence, RailServe was sued in the instant case and once it's corporate representative testified that Driggers was their employee, RailServe was dropped from the litigation. Mr. Haugh's testimony has been filed with the Court.

It is without dispute that the Contract required RailServe to provide comp insurance, which it did. RailServe's worker's compensation carrier paid benefits to the plaintiff in accordance with that responsibility, accepting as a matter of law that Driggers was their employee.

The exclusive remedy doctrine therefore applies to RailServe, not Georgia Pacific. This point also ties in legally with the point raised regarding worker's compensation immunity under the borrowed servant doctrine. The leading case dispositive of this issue and material to the court's review of this matter is *Employers Insurance of Wausau v.*

-11-

*Abernathy,* 442 So.2d 953 (Fla. 1983).   In that case the Supreme Court of Florida permitted a tort claim to proceed against a subcontractor, due to negligence of the subcontractor's employees, where the employee had made a worker's compensation claim against his employer and its carrier.   The court in affirming the employee's right to proceed in such a manner stated succinctly:

> *The justification for limiting liability or granting immunity is the substitution of something else in its place a quid pro quo. The duty to provide worker's compensation benefits supplants tort liability to those injured on the job.(Citing cases).* **If the duty to provide such coverage does not exist, then one has no reason to expect immunity from wrong doing against a third party.**   Supra at 954 (Emphasis added)

In this case, G-P did not provide worker's compensation benefits, nor have any duty to do so.   Georgia Pacific therefore can enjoy no immunity and the exclusive remedy doctrine simply does not apply to them.

## IV. Conclusion and Relief Sought By Plaintiffs

The Plaintiffs respectfully request this court grant them an extension for the filing and service of this response to Motion for Summary Judgment and incorporated memorandum of Law and further request that the Motion ultimately be denied as a matter of law.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Rule 3.01 (d) of the Local Rules of the Middle District, Plaintiff hereby requests oral argument as to the matters contained in Defendant's Motion for Summary Judgment.

Respectfully Submitted,

_____
Chobee Ebbets, Esquire

-12-

I HEREBY CERTIFY that a true copy of the foregoing (together with attachments) has been furnished by Federal Express to: Thomas E. Bishop, Esq., Holland & Knight, 50 N. Laura Street, 39th Floor, Jacksonville, FL 32202 this 30th day of October, 2001.

Chobee Ebbets, P.A.
Ebbets, Armstrong & Traster
210 South Beach Street, Suite 200
Daytona Beach, FL 32115
(904) 253-2288
Attorney for Plaintiff
Fla. Bar No. 218294

## SWITCHING SERVICES AGREEMENT

THIS AGREEMENT ("Agreement") made this __31st__ day of August, 1995, by and between **RAIL SWITCHING SERVICES, INC.**, a Florida corporation, whose address is Post Office Box 28300, Panama City, Florida, 32411 (hereinafter referred to as "RSS"), and **GEORGIA-PACIFIC CORPORATION**. a Georgia corporation, whose address is 133 Peachtree Street, N.E., Atlanta, Georgia 30303 (hereinafter referred to as "G-P").

### WITNESSETH

**WHEREAS** G-P is a corporation engaged in the production of forest products and, in connection therewith, owns real property and operates thereon a mill facility in, Putnam County, Florida (collectively the "Plant"); and

**WHEREAS,** some of the raw materials shipped to and some of the finished and other products shipped from the Plant are conveyed by railcars; and

**WHEREAS,** located on the Plant are certain railroad tracks and switches owned or leased by G-P and on which RSS will perform railroad switching services, as more particularly described on Exhibit A attached hereto and incorporated herein by reference (the "Tracks); and

**WHEREAS,** RSS is a corporation engaged in the provision of railroad switching and related switching services; and

**WHEREAS,** G-P desires to secure and obtain, and RSS desires to provide, railroad switching services at the Plant.

74078.v2



$EXHIBIT$ 1

In consideration of the mutual covenants, conditions and promises set forth herein, the receipt and sufficiency of which are specifically acknowledged by the parties hereto, the parties agree as follows:

1.   **Services**.  RSS agrees to furnish G-P with all railroad switching services required by G-P on the Tracks at the Plant during the term of this Agreement.  Railroad switching is defined as all rail car movement within the Plant, excluding the initial placing of inbound cars and the pulling of outbound cars from or to line haul movements by railroad companies with whom G-P may consign freight for line haul services.  In providing G-P with such services, RSS shall furnish one (1) locomotive, which shall be located at the Plant twenty-four (24) hours per day, seven days per week, fifty-two (52) weeks per year, and shall be available at all times for use at the Plant; a switching crew consisting of one engineer and one ground crewman, which shall provide a base level of switching services (the "Base Level") six (6) days per week, fifty-two (52) weeks per year, consisting of the following shifts:

Monday:  One eight (8) hour shift

Tuesday through Friday:  One seven (7) hour shift per day

Saturday:  One four (4) hour shift.

In addition to the Base Level, RSS shall provide locomotive fuel and all necessary maintenance, repairs and upkeep of all switching equipment, excluding the Tracks; all two-way communications equipment; and all necessary supervision of its switching operations (all of said services collectively defined as the "Switching Services").  The Base Payment (hereinafter defined) shall include a total of two (2) on-site personnel.  The motive power and

74078.v2

communications equipment shall meet all applicable state and federal requirements and standards. All crew members shall be fully qualified to perform the tasks assigned to them and shall possess and keep in force throughout the term any licenses, certifications and approvals necessary to the performance of the Switching Services.

2.      **Trackage.** RSS shall provide all Switching Services requested by G-P within the Plant and on the Tracks.

3.      **Compensation.** Subject to adjustments pursuant to the terms hereof, G-P agrees to pay RSS the base sum of $2,690.38 per week ("Base Payment") for Base Level Switching Services rendered by RSS. Invoices will be submitted to the Plant's Traffic Manager at the traffic office of the Plant on a bi-weekly basis, and G-P will pay the amount due in full 15 days from receipt of the invoices.

4.      **Compensation Adjustments.** Upon completion of the first year of the term of this Agreement, and on each succeeding anniversary of such date thereafter, the Base Payment shall be adjusted by a percentage equal to any percentage increase or decrease in the Producer Price Index - All Commodities Index ("PPI") as measured for the twelve (12) calendar month period beginning with the August 1995 (or, if not published in August 1995, then in the month immediately preceding August 1995 in which the PPI is last published) and ending August 1996 (or the last month preceding said month in which the PPI is published), and thereafter by the percentage increase in the PPI for the twelve (12) calendar month period following the date of the last adjustment made pursuant to this paragraph; provided, however, that in no event shall any increase for any such twelve (12) calendar month period exceed two percent (2%). Further, if the PPI for the initial or any subsequent adjustment period decreases, the Base

-3-

74078.v2

Payment shall not be reduced; however, the aggregate amounts which G-P would not have paid if this Agreement permitted reductions in the Base Payment based on decreases in the PPI shall be credited against any future increases in the Base Payment.

5.  **Overtime**.  G-P may require RSS to perform Switching Services above and beyond those described as the Base Level in Section 1 above.  Such additional Switching Services will be performed by RSS upon G-P's request.  Such additional Switching Services will be invoiced by RSS at $75.00 per hour, or fraction thereof, provided that such additional Switching Services provided are contiguous with a regularly scheduled shift.  However, if RSS performs additional Switching Services beyond the Base Level that are not contiguous with a regularly scheduled shift, G-P shall pay $75.00 per hour for a two (2) hour minimum amount of such additional Switching Services regardless of the actual time expended by RSS to accomplish such additional Switching Services.



6.  **Term**.  Subject to the other provisions of this Agreement, this Agreement shall commence on September 1, 1995, and shall continue in effect for three (3) years, and thereafter shall automatically renew for additional successive one (1) year periods unless and until either party gives notice to the other in accordance with Section 17, at least 120 days before the end of the three (3) year term or any such successive one-year period, terminating this Agreement at the end of such term or period.

7.  **Maintenance and Repairs**.  G-P shall endeavor to keep the Tracks clear and passable at all times, and RSS shall have no liability for failure to provide Switching Services if G-P fails to keep the Tracks clear and passable, unless the obstruction is due to the negligent act

-4-

or omission of RSS. All railroad tracks and switches shall be maintained and repaired by G-P, but RSS shall promptly advise G-P in writing of any maintenance and repairs which RSS believes are necessary to the safe and efficient performance of its Switching Services hereunder. All motive power shall be maintained, serviced, repaired, and refueled by RSS.

8. **Labor Warranty.** RSS warrants that it will exercise reasonable diligence to furnish Switching Services hereunder during any labor dispute, strike, or work stoppage with or by its or G-P's employees, and G-P and RSS agree that each will take all action, including court action, reasonably necessary to prevent or terminate the same without interruption of its Switching Services hereunder. In the event RSS is unable to reasonably perform the Switching Services required herein during any labor dispute, strike, or work stoppage, G-P may, at its option, notify RSS of the suspension of the terms of this Agreement until resolution of the dispute occurs.



9. **Termination.** In the event RSS's performance is unsatisfactory to G-P in G-P's reasonable discretion, then G-P shall give RSS written notice of the nonperformance or, in the case of unsatisfactory performance, the reason therefor, and RSS shall be allowed thirty (30) days thereafter to begin performance or render it satisfactorily. Should performance by RSS not be made satisfactory after said thirty (30) day period, this Agreement may be terminated by G-P.

10. **Loss or Damage to Product**. RSS shall be liable for loss or damage to freight loaded in cars handled by RSS if such damage occurs while in RSS's care, custody and control, which is caused or contributed to by acts or omissions to act of RSS, its employees,

-5-

subcontractors, agents or business invitees in connection with the performance of this Agreement by RSS, or the breach by RSS of any of the terms, conditions or provisions of this Agreement.

10.01  G-P shall be liable for any loss or damage to freight loaded in cars, and for any loss or damage to any switching equipment provided by RSS, if such damage is caused or contributed to by acts or omissions to act of G-P, its employees, subcontractors, agents or business invitees in connection with the performance of this Agreement by G-P, or breach by G-P of any of the terms, conditions or provisions of this Agreement.

11.    **Compliance with Laws and Standards.**  In the performance of all Switching Services hereunder, RSS will at all times comply with the requirements of all applicable federal, state and local laws, regulations, standards and ordinances; and shall obtain all necessary and/or appropriate licenses, permits and other authorizations required to render the Switching Services. .  In addition, RSS shall perform all Switching Services in accordance with its Code of Operating Rules (attached hereto as Exhibit B), and in accordance with all Plant safety and security requirements.

12.    **Indemnification.**

12.01  RSS, its successors and assigns, shall defend, indemnify and hold G-P harmless from and against any and all liability for damage to property, injury to or death of any person (including RSS's employees, subcontractors, agents and business invitees) or for claims, damages, penalties, fines, demands, liabilities and suits of every kind and nature arising from or in connection with the Switching Services, to the extent caused or contributed to by acts or omissions of RSS, its employees, subcontractors, agents or business invitees in connection with

-6-

the performance of this Agreement by RSS, or the breach by RSS of any of the terms, conditions or provisions of this Agreement (except for claims arising out of loss or damage to freight, which is covered by Section 10).

12.02   RSS, its successors and assigns, shall defend and hold G-P harmless from and against any and all liability for alleged or actual work-related injuries or illnesses of any of RSS's employees, related to the Switching Services, except for those claims attributable to the negligent act or omission of G-P employees while said G-P employees are performing employment-related functions for G-P at the Plant.

G-P, its successors and assigns, shall defend and hold RSS harmless from and against any and all liability for alleged or actual work-related injuries or illness of any employees of G-P, except for those claims attributable to the negligent act or omission of RSS employees while said RSS employees are performing employment-related duties in connection with the Switching Services at the Plant.



12.03   G-P, its successors and assigns, shall defend, indemnify, and hold RSS harmless from and against any and all liability for damage to property, injury to or death of any person, including G-P's employees, subcontractors, agents and business invitees, or for claims, damages, penalties, fines, demands. liabilities and suits of every kind and nature, to the extent caused by acts or omissions of G-P, its employees, subcontractors, agents or business invitees, or by any breach by G-P of any of the terms, conditions or provisions of this Agreement (except for claims arising out of loss or damage to freight, which is covered by Section 10.)

74078.v2

12.04  Neither G-P nor RSS may recover from the other any indirect, special or consequential damages, including without limitation indirect, special or consequential damages sought by third parties. However, this restriction shall not include indirect, special or consequential damages sought by third parties which arise, directly or indirectly, out of bodily injury, personal injury, or property damage, as those terms are defined in the present ISO standard commercial liability policy forms.

12.05  Each party indemnified under any applicable provisions of this Agreement upon receipt of written notice of any claim or the service of a summons or other initial legal process upon it in any action instituted against it, in respect of which indemnity may be sought on account of any indemnity hereunder shall promptly give written notice of such claim, or the commencement of such action, or threat thereof, to the party from whom indemnity shall be sought thereunder.



13.   **Insurance**.

13.01  RSS shall, at RSS's sole cost and expense, maintain in full force and effect for the duration of this Agreement, the following types and amounts of insurance, at a minimum:

(a)     Workers' Compensation Insurance, with statutory limits as required by the laws and regulations applicable to the employees of RSS who are engaged in the performance of this Agreement;

(b)     Employer's Liability Insurance, for employee bodily injuries and deaths, with a limit of at least $500,000 each accident;

74078.v2

(c)    Comprehensive Railroad General Liability Insurance, covering claims for bodily injury, death and property damage, including Comprehensive Form, Premises and Operations, Independent Contractors, Products and Completed Operations, Personal Injury, Contractual and Broad Form Property Damage liability coverage on an occurrence basis.  This policy shall not be less than $2,000,000 Combined Aggregate Limit and $1,000,000 for bodily injury, death and property damage each or per occurrence;

(d)    Comprehensive Automobile Liability Insurance covering owned, non-owned, hired and other vehicles with a Combined Single Limit of $1,000,000 for damages due to bodily injury (including death) or property damage per occurrence;

(e)    Broad Form Contractual Liability Coverage providing insurance as to the liability of RSS to G-P contained in Section 12.

13.02  RSS may, at its option, maintain other insurance coverage at its sole discretion and expense for the protection of RSS and/or G-P in connection with its operations under this Agreement.  Certificates evidencing such insurance shall be provided to G-P for information.

13.03  Such insurance coverage as required by Section 13 shall be effective no later than the date RSS begins performance of Switching Services at the Plant. Certificates of Insurance evidencing all coverages specified in this Section 13 shall be furnished by RSS's insurance carrier to G-P prior to said date.  Current, active Certificates of Insurance shall be

-9-

similarly submitted upon request of G-P to document continuous coverage as specified in this Section 13. These Certificates shall contain a provision that the insurer shall notify G-P at least thirty (30) days prior to any policy cancellation. Any such change, non-renewal or cancellation will not affect RSS's obligation to maintain the insurance coverages set forth above.

RSS shall be responsible for the amounts of any and all deductibles from insured claims under its insurance policies. All policies of insurance of RSS shall be primary coverage as to G-P in all instances regardless of similar coverage, if any, carried by G-P. Except for Worker's Compensation Insurance, G-P shall be an Additional Insured on all policies of insurance of RSS required herein. All insurance policies are to be written with carriers reasonably acceptable to G-P. The amounts of insurance required herein shall in no way limit RSS's liability to G-P or other parties as set forth in Section 12.



14. **Independent Contractor Status**.

14.01  RSS shall render Switching Services hereunder in the capacity of an independent contractor. Employees of RSS performing Switching Services hereunder shall be hired, supervised, managed, controlled, disciplined and discharged exclusively by RSS and shall not be deemed to be employees of G-P for any purpose whatsoever. G-P shall not be responsible for any acts or omissions to act of said employees, unless specifically provided for herein.

14.02  RSS assumes full responsibility for, and shall defend, indemnify and hold G-P harmless from and against any and all losses, damages, charges and liabilities arising from or in connection with claims relating to (i) wages or salaries paid or payable to RSS employees; (ii) the failure of RSS to make or cause to be made, full and proper payment to the appropriate

-10-

agency of all federal, state and/or local social security payments or taxes, unemployment compensation taxes or assessment or income taxes withheld from employee salaries and wages; (iii) any fringe benefit, pension or similar plan involving RSS employees; and (iv) any other duty of RSS to its employees and/or their wages, salaries and fringe benefits.

15. **Environmental**.

15.01  RSS will defend, indemnify and hold G-P harmless from and against all claims, liabilities, losses, damages, fines, penalties, payments, costs and expenses (including without limitation reasonable legal fees), including without limitation liabilities under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §9601, et seq., as amended ("CERCLA"), or the Resource Conservation and Recovery Act, 42 U.S.C. §6901, et seq., as amended ("RCRA"), resulting from any environmental remediation required by applicable laws, regulations or directives of governmental authorities as a result of RSS spilling or releasing any hazardous or toxic substance or waste at the Plant.  G-P will defend, indemnify and hold RSS harmless from and against all claims, liabilities, losses, damages, fines, penalties, payments, costs and expenses (including without limitation reasonable legal fees), including without limitation liabilities under CERCLA or RCRA, resulting from any environmental remediation required by applicable laws, regulations or directives of governmental authorities as a result of the spill or release at any time of any toxic or hazardous substance or waste at the Plant by anyone other than RSS, unless the acts of third parties are attributable to the active negligence of RSS and not of G-P.



15.02   Without limiting the generality of the foregoing, RSS further agrees to be responsible for the cost of all investigations, monitoring and cleanup or other remedial obligations that may be required as the result of contamination of soils or groundwater in, on, or about the Plant and off site wherever it may occur, to the extent such contamination results from RSS spilling or releasing any hazardous or toxic substance or waste.

Without limiting the generality of the foregoing, G-P further agrees to be responsible for the cost of all investigations, monitoring and cleanup or other remedial obligations that may be required as the result of contamination of soils or groundwater in, on, or about the Plant and off site wherever it may occur, to the extent such contamination results from G-P spilling or releasing any hazardous or toxic substance or waste.



15.03   Notwithstanding any of the foregoing provisions of this Section 15 to the contrary, RSS shall not be liable for any cleanup, remediation or cost to the extent it results from any spill or release occurring prior to the date RSS commences operations at the Plant, but in any case where RSS seeks the benefit of this provision and RSS has spilled or released any hazardous or toxic substance or waste, RSS shall bear the burden of proving such preexisting condition.

16.   **Inurement and Assignment**.  This Agreement shall be binding on the parties hereto and their respective heirs, executors, representatives, successors and assigns.  This Agreement is a personal service agreement, and neither party shall assign its rights or obligations hereunder without the prior written consent of the other party hereto.

17.   **Notice.**  All notices required to be given in writing by this Agreement shall be delivered or mailed and shall be deemed to have been sent when delivered or when mailed by

74078.v2

deposit in first class mail, registered or certified, postage prepaid, addressed to the address of the party for which the notice is intended, as set forth above or as changed from time to time by a notice delivered or mailed in like manner.  Any delivered notice shall be deemed to have been received upon delivery, and any notice so mailed shall be deemed to have been received forty-eight (48) hours after it has been mailed in the manners described above.

     **18.**    <u>**Force Majeure.**</u> In the event that the performance by either party of any of its obligations or undertakings hereunder shall be interrupted or delayed by any occurrence outside the reasonable control of such party and not occasioned by the conduct of such party, whether such occurrence be an act of God or the common enemy or the result of war, riot, civil commotion, sovereign conduct, or the act or conduct of any person or persons not party or privy hereto, such party shall be excused from such performance for such period of time as is reasonably necessary after such occurrence to remedy the effects thereof, not to exceed ninety (90) days.

     **19.**    <u>**Governing Law**</u>.  This Agreement shall be governed by and construed in accordance with laws of the State of Georgia.

     **20.**    <u>**Facilities**</u>.  G-P will, at its expense, designate a space within the Plant for RSS to place an office trailer at the Plant.  This location will be within reasonable walking distance to and from the locomotive storage area.  G-P will, at its expense, provide connections for water, electricity and telephone at the office location, and will provide on-going water, electricity, septic systems and local phone services.  RSS will be responsible for any long distance calls.

-13-

21.   **Miscellaneous.** This Agreement contains the entire understanding and agreement of the parties hereto in respect of its subject matter and supersedes all prior Agreements and undertakings between the parties with respect to such subject matter. This Agreement may be amended only by a written instrument duly executed by both of the parties or their respective successors or assigns. Any condition to a party's obligation to perform hereunder may be waived by such party but only if such waiver is in writing. The failure of either party to exercise any right hereunder, or to take any action permitted on a breach by the other party, shall not be deemed a waiver thereof or of other or future rights or breaches of a like or different nature. The use of the masculine, feminine or neuter gender shall be deemed to mean the correct gender applicable and the use of the singular shall include the plural or vice versa, as the context may require. The headings in this Agreement are used solely for reference purposes and have no effect on the rights or obligations of the parties hereto. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to each of the parties. The parties agree that delivery of counterparts by telecopy transmission is acceptable for purposes of effectuating the Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

AGREED to on this __31st__ day of __August__ 1995

**GEORGIA-PACIFIC CORPORATION**

By: _N. Langley_

Its: _Director - Logistics_


**RAIL SWITCHING SERVICES, INC.**

Kevin R. Haugh

Its:    Vice President - General Manager

-15-

74078.v2

<u>Exhibit A</u>

**Diagram of Mill Tracts**



74078.v2



Georgia-Pacific Corporation
Georgia Southern and Florida Railway Company
Palatka, Florida

To CSXT

Main Line

To Mill

To GS&F

Drawing Not to Scale

